UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SHAWN PARISEAU, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| v. | ) | NO. 09-10624-JGD |
| | ) | |
| CAPT. JOHN BOATS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND RULINGS OF LAW

February 16, 2012

DEIN, U.S.M.J.

## INTRODUCTION

This admiralty action arises from an accident that occurred on September 1, 2007, when the plaintiff, Shawn Pariseau ("Mr. Pariseau"), was a passenger on a fishing trip aboard the Capt. John & Sons II, a charter vessel owned and operated by the defendant, Capt. John Boats, Inc. ("CJB"). During the course of the fishing trip, Mr. Pariseau fell onto the deck of the boat and sustained injuries, including a broken leg. He claims that his fall was caused by CJB's negligence. Mr. Pariseau is seeking compensatory damages for the pain and suffering, loss of earning capacity, and emotional trauma that he allegedly suffered as a result of CJB's conduct. In addition, he is seeking an award of punitive damages designed to deter CJB from operating its fleet in an unsafe manner.

CJB denies that it was negligent, and it contends that if anyone was at fault for Mr. Pariseau's injuries, it was the plaintiff because he failed to take reasonable precautions to

protect his own safety.  It also contends that even if the court were to find CJB liable for damages, Mr. Pariseau has failed to meet his burden of proving that he suffered lost wages or a diminished earning capacity, or that he is entitled to anything more than certain documented medical expenses.

The bench trial of this matter took place on September 12, 13, 14 and 20, 2011, and the parties submitted proposed findings and rulings by November 1, 2011.  This court has reviewed the transcripts, exhibits, and the parties' submissions.  Based on the evidence presented, the court makes the following findings of fact and rulings of law.  As detailed below, this court finds that Mr. Pariseau has not proved, by a preponderance of the evidence, that CJB breached its duty of care, or that its conduct was the proximate cause of Mr. Pariseau's injuries.  Therefore, and for all the reasons set forth herein, judgment shall be entered in favor of the defendant.

## FINDINGS OF FACT[1]

## The Parties and Witnesses

1.      The incident giving rise to this litigation occurred at approximately 8:30 a.m. on the morning of September 1, 2007, when Mr. Pariseau was a passenger aboard

---

[1] Plaintiff has submitted  proposed findings of fact ("PFF"), which are set forth in his Trial Brief beginning at page 54 (Docket No. 62).  His proposed rulings of law ("PRL") are set forth in his Trial Brief beginning at page 62.  The defendant's proposed findings of fact and rulings of law ("DFF") are contained in the "Defendant's Requests for Findings of Fact, Rulings of Law and/or Adjudications on Mixed Questions of Fact and Law" (Docket No. 64).  Exhibits from the trial are cited as "Ex.," and trial testimony is cited by the witness' name followed by the volume and page number of the transcript.

the fishing vessel, the Capt. John & Sons II. (Exs. 4 & 8). At all relevant times, CJB was the owner and operator of the Capt. John & Sons II. On the date of the accident the Capt. John & Sons II was certified by the Coast Guard as being "in conformity with the applicable vessel inspection laws and the rules and regulations prescribed thereunder." (Ex. 22).

2.     The plaintiff, Shawn Pariseau, was a repeat customer on CJB's fishing trips: he would try to go on a trip at least once a year. (Pariseau I:41-42). On September 1, 2007, Mr. Pariseau was accompanied by five children ranging in age from about 9 to 15 years old, including Mr. Pariseau's two children, his niece and nephew, and his girlfriend's son, Weyland LaBelle, whom the plaintiff treats as his stepson. (Pariseau I:35-36). Only one of the children had been on an ocean fishing boat previously, and all of them were very excited about the trip. (Ex. E at 8, 10-11).

3.     Weyland LaBelle testified at trial. The deposition transcripts of the other four children were submitted into evidence by agreement. (Exs. C-F).

4.     On September 1, 2007, the Captain of the Capt. John & Sons II was Captain Aidan Manning. Captain Manning was licensed by the United States Coast Guard as a U.S. Merchant Marine Officer qualified to operate vessels like the Capt. John & Sons II, and was trained in First Aid. (PFF ¶ 18; see Murphy III:62; Ex. 21). Captain Manning was a seasonal employee of CJB, and worked during the sailing seasons in 2007 (when the accident occurred), and again in 2008, after which he left the company. (Bradley III:75, 97). His departure from the company was voluntary, and was not related to his

3

performance.  (See Bradley III:97).  Captain Manning could not be located during the course of this litigation by any party.  He was not deposed and he did not testify at trial.

5.      On September 1, 2007, in addition to Captain Manning, the crew of the Capt. John & Sons II consisted of deckhands Jeffrey Silverberg and Leo Murphy, and an individual named Ben who worked in the galley of the boat where there was a snack bar.  (See Ex. 7).  Mr. Silverberg was certified in First Aid and CPR.  (Exs. 26 & 27).  Mr. Murphy had been trained in First Aid as well.  (Murphy III:61-63).  Messrs. Silverberg and Murphy testified at trial.

6.      As of September 1, 2007, Erin Bradley was a Manager of CJB.  (Bradley III:74).  She was not on the trip, but was notified of the incident.  (Bradley III:83-84).  Ms. Bradley testified at trial.

7.      After Mr. Pariseau's accident, and before the boat returned to the harbor, Officer Jose Vico of the Plymouth Harbor Master Department boarded the Capt. John & Sons II to assist with Mr. Pariseau.  (Vico II:57).  Officer Vico testified at trial.

8.      Captain Craig Dalton testified as an expert on behalf of the plaintiff.  Captain Dalton is a Professor at the Massachusetts Maritime Academy, and is qualified as a Master (Captain) of any size vessel.  (Dalton II:90; Ex. 6).

9.      Captain James Staples testified as the expert for CJB.  He spent his career in the United States Merchant Marine and is qualified as a Master (Captain) of any size vessel.  (Staples III:117-119; Ex. 25).

**Boarding of the Vessel**

10. On September 1, 2007, CJB operated two fishing vessels that departed Plymouth Harbor at 7:00 a.m. Mr. Pariseau and his family traveled on the Capt. John & Sons II, which was scheduled to return at 1:00 p.m., while the second vessel was scheduled to return at 3:00 p.m. (Bradley III:77). In addition, CJB operated three whale watching trips with departure times of 9:00 a.m., 11:00 a.m. and 2:00 p.m., as well as an afternoon fishing trip that began at 2:00 p.m. on the same boat on which the plaintiff was injured. (Bradley III:77-79). All the other trips took place as scheduled on September 1, and operated normally without incident. (Bradley III:78).

11. To the extent that it is an issue, I find that there was nothing inappropriate in the Capt. John & Sons II going out to fish on September 1, 2007, and that the defendant was not negligent in running the fishing trip that day.[2]

12. The weather was fine at the time the passengers boarded the boat. (LaBelle I:165-66). According to Mr. Pariseau, when they left the harbor, there were no waves, the boat was not bouncing around, and he and his children "were enjoying the beautiful views of the ocean." (Pariseau I:116-17).

---

[2] The plaintiff has conceded that he is not challenging the decision to take the boat out on the day of the accident. (See II:97; Joint Pre-Trial Mem. (Docket No. 55) at 1 (explaining that plaintiff will present evidence that Captain Manning operated the vessel improperly given the sea and weather conditions, but not challenging decision to go out in the first place)). While the plaintiff's expert opined that "there wasn't adequate training, monitoring or procedures involved to determine whether the trip should proceed," (Dalton II:98), I do not need to address that testimony since the decision to go fishing is not being challenged. I do note, however, that there was credible evidence that the members of the crew took appropriate steps to check the weather conditions before starting out.

13. It was customary before going out that the captains of CJB's vessels would talk among themselves to determine if the weather was good enough for them to go out. (Bradley III:81-82). As noted above, all of the boats scheduled for September 1, 2007 departed as scheduled.

14. In order to check the sea conditions, mariners can check buoy information from weather buoys located in the appropriate area. As detailed infra, there are two such buoys which are relevant to ascertaining sea conditions where the accident took place. In addition, the sea conditions are reported on the marine radio. On September 1, 2007, deckhand Jeffrey Silverberg checked the buoy information, which reported a 3½ foot sea. (Silverberg IV:20). On the marine radio, it was being reported that seas were 3 to 5 feet, and there was a northeast[3] wind of 15 to 20 knots, with gusts of 25 knots.[4] (Silverberg IV:20). As detailed infra, I find that these were the conditions at the time of the accident.

15. Seas of 3-5 feet would result in a somewhat "bumpy" ride, but not an unusually uncomfortable ride on the Capt. John & Sons II. (Staples III:145; Silverberg IV:20-21). It would be reasonable to take passengers fishing under such conditions. (Staples III:145).

_____

[3] While Mr. Silverberg said northwest, plaintiff's "counsel believes [he] misspoke or there was a transcription error[.]" (Pl.'s Trial Brief (Docket No. 62) at p. 11). All the witnesses agree, and the exhibits confirm, that there was a northeast wind.

[4] It is not entirely clear from the testimony that Mr. Silverberg was describing the wind speed in knots rather than in miles per hour. Even if he meant miles per hour, the difference is not significant and it would not make a difference in the court's ultimate finding that the defendant's conduct was not negligent.

16.     However, when the ride was expected to be somewhat bumpy it was customary to forewarn the passengers and give them an opportunity to get a refund and go another day.  (See Murphy III:36-37).  I find credible Mr. Silverberg's testimony that this was done on the day of the accident, and that as the passengers were boarding, crew members notified them that the trip would be bumpy, and that they had the option of rescheduling or taking a refund.  (Silverberg IV:24-25).  In light of the fact that CJB is in the tourism industry, and has been for years, it makes sense to this court that the crew would try and avoid unhappy passengers.

17.     According to their testimony, neither the plaintiff nor the children recalled hearing any such statements prior to boarding the vessel.  (See, e.g., Pariseau I:39; LaBelle I:166-67).  However, they recalled hearing a safety announcement once they were on the boat in which a member of the crew described the location of safety devices and instructed passengers regarding what to do in an emergency.  (Pariseau I:43-44; LaBelle I:169-70).  One of the children also recalled the announcer warning the passengers that there would be some big waves crashing into the boat, and although it would not be too bad, the passengers should try to stay in their seats and hold onto the railing until the vessel came to a stop.  (Ex. C at 16).

18.     Weyland LaBelle testified that when he got on board in the morning, he had to walk past the wheelhouse and that it reeked of alcohol and vomit.  (LaBelle II:15-17, 51).  I do not credit this testimony.

19.     As an initial matter, it was apparent throughout his testimony that Mr.

LaBelle was trying very hard to support the plaintiff, whom he considers to be like a

father to him, and as a result exaggerated the events surrounding Mr. Pariseau's accident.

In addition, this testimony is inconsistent with other, verifiable facts.  For example, there

would be no reason for a passenger boarding the Capt. John & Sons II to walk past the

wheelhouse, which is located some distance away from where the passengers board the

boat, and in the opposite direction from where the passengers, including those passengers

going to sit in the bow where Mr. Pariseau and his family sat, would normally walk.

(Murphy III:30-31).  Moreover, if the wheelhouse was in such a terrible condition, it

defies logic that the door to the wheelhouse would be kept open for passengers to witness

its condition.  In fact, the door to the wheelhouse is generally kept closed during boarding

(Murphy III:60), and the Captain is on shore for at least part of the time greeting

passengers.  (Silverberg IV:24-25).  Furthermore, the deckhands, who spent time in the

wheelhouse on September 1, 2007, testified that there was no evidence that the Captain

had consumed any liquor.  (See Silverberg IV:61; Murphy III:48-49).  The deckhands

relied on Captain Manning's ability to operate CJB's vessels safely during the course of

their employment with the company, and I credit their testimony that they would have

refused to board the boat and alerted Captain Manning's superiors if there had been

evidence that the Captain had been drinking.  (See Silverberg IV:61-62; Murphy III:48-

49).  Finally, Mr. Pariseau himself did not testify either that this was a condition that he

observed or that he was told about.  If Mr. LaBelle had noted the condition of the

wheelhouse at the time, it is likely that he would have discussed it with the plaintiff. Instead, Mr. Pariseau testified that it was a very pleasant start to the trip, with nothing untoward, and that he had no concerns.  (See Pariseau I:116-17).

20.     The plaintiff and the children found seats on the main deck of the boat in the bow, although the plaintiff did allow some of the children to go to the stern to see the view.  (See Pariseau I:40, 116-17; Ex. 3).  Passengers in the bow feel more of the boat's movement than passengers sitting in the stern.  (Silverberg IV:34-35).  There is an enclosed galley on the boat, with seats and tables.  Some of the children went into the galley for a brief period of time, but Mr. Pariseau never took his family inside during the course of the trip.  (Ex. C at 17-18; Ex. F at 19-20).

21.     After the passengers had boarded, the Capt. John & Sons II left the dock and proceeded through Plymouth Harbor toward Cape Cod Bay.  It headed in a northeasterly direction up to the coast toward fishing grounds known as Stone Ledge.

22.     At some point prior to reaching the open ocean, the second fishing vessel owned by CJB was running parallel to the Capt. John & Sons II, and there was some testimony that Captain Manning began increasing the speed of the vessel.  (LaBelle I:170-71).  Some of the children heard remarks from the crew members suggesting that the two boats were racing or appeared to be racing.  (LaBelle I:171; Ex. D at 32; Ex. E at 18). However, the boats headed in different directions once they reached the open ocean, and none of the witnesses suggested that the boats were racing at the time the plaintiff fell and sustained injuries.  (Pariseau I:45-46; LaBelle I:173).

## Overview of the Case

23.   Certain events are not in dispute, or at least were not disputed for purposes of the trial.  Thus, the parties agree that the fishing trip left the dock at approximately 7:00 a.m.  Mr. Pariseau fell at approximately 8:30 a.m., shortly before the boat reached the Stone Ledge fishing area.  After Mr. Pariseau fell, the fishing trip continued, and after traveling a short distance, the boat stopped to allow some fishing.  After a short while, the boat moved to another fishing location and stopped again.  At approximately 10:05 a.m., the Captain called the Harbor Master's Office and reported an injured passenger.  The Captain John & Sons II returned to Plymouth Harbor and docked at approximately 11:00 a.m.  (See Dalton II:122, 149-50; Pariseau I:55, 70-74; Ex. 4).

24.   The plaintiff's theory of negligence appears to be that while going out to fish was appropriate on September 1, 2007, the boat was traveling too fast for the weather conditions, and that as a result of the speed he fell and was injured.  As an initial matter, this court finds that plaintiff has not put forth any evidence as to what would have been an appropriate speed, or how reducing the boat's speed would have prevented the accident.  Plaintiff's expert admitted that he does not know what speed the boat should have been going to minimize the rocking, and further testified that he did not believe that sea or weather conditions were such that the boat had to turn around.  (Dalton II:190-91).  On the other hand, plaintiff's expert also testified that he believed the waves were very high and exceeded those encountered in a hurricane.

25.     According to the plaintiff's expert, once people became uncomfortable, the vessel should have slowed down incrementally to a speed at which "people can move around safely or at least hang on safely and there's no risk of damage to the boat." (Dalton II:123-24).  However, he did not rule out the possibility of someone falling while the vessel was slowing down, and testified that accidents can happen even if the vessel is being operated properly.  (Dalton II:159; <u>accord</u> Staples III:154).  In fact, the uncontradicted testimony was that reducing the boat's speed could have made the pitching deeper, and the trip rockier, not calmer.  (Staples III:147).  Given this testimony, even if this court were to credit the plaintiff's version of the events that transpired (which, as detailed below, I do not), the plaintiff still did not meet his burden of proving that the defendant was negligent because of excessive speed.

26.     The plaintiff also argues that the crew members did not take appropriate actions after he fell and was injured, and that the boat should have turned around right away, or he should have somehow received medical treatment more promptly.  There is no evidence, however, that the plaintiff's medical condition worsened as a result of any alleged delay.  Thus, again, even if this court were to credit the plaintiff's version of events (which, as detailed below, I do not), the post-accident events are not relevant to the issue whether the defendant's negligence caused the plaintiff's injuries.

27.     As a general statement, Mr. Pariseau described a trip of total bedlam, with numerous passengers getting sick and falling, and a gross indifference by all crew members to his injuries, pain and suffering.  The defendant's witnesses, in contrast,

described a fairly routine trip where, although some of the children were a bit queasy, no other passengers were ill, no one else was injured, and the children enjoyed the fishing. According to the defense witnesses, Mr. Pariseau initially rejected all offers of medical treatment, his concern being primarily that the children have a good time. When he started to feel pain and complain, defense witnesses assert that the boat was turned around to return to port, and all appropriate medical treatment was given for an injury which, at the time, Mr. Pariseau represented was not serious. As detailed below, based on this court's observation of the witnesses and analysis of objective facts, this court finds the defense version of events far more credible and supportable by the record.

## Sea and Weather Conditions

28.     Mr. Pariseau testified that after they left the harbor, the speed of the vessel accelerated rapidly and the boat began to hit the waves with great force. (Pariseau I:44-45, 50-51). As the plaintiff described it, the scene on the bow of the boat was one of "chaos." The passengers were waving their arms, throwing things and yelling up to the wheelhouse where the Captain was located in an unsuccessful effort to get him to slow down, the children were scared and crying, everyone was getting thrown into the air and back onto their seats due to the force of the waves, a number of passengers fell onto the deck of the boat, and all of the children were nearly thrown overboard. (Pariseau I:48-52, 55, 120-21).

29.     Additionally, Mr. Pariseau testified that although he was holding on tightly to a cable that ran along the side of the vessel, the movement of the boat was so

significant that he was propelled anywhere from four inches to a foot off his seat as the vessel encountered the waves. (Pariseau I:47, 118-20). According to the plaintiff, it was on one such occasion when he was propelled off his seat that he fell directly onto the deck, hitting the entire right side of his body and sustaining injuries. (Pariseau I:51-52, 120).

30. Based on my observations of the witnesses at trial and consideration of all the evidence presented, this court finds that Mr. Pariseau greatly exaggerated the conditions which immediately preceded his fall.

## Actual Weather and Sea Conditions

31. As an initial matter, I find that the actual sea conditions were not consistent with Mr. Pariseau's testimony. According to plaintiff's expert, for all the bouncing as described by the plaintiff to have taken place, the seas would have had to have been at 6 to 12 foot waves. (See Dalton II:177-78). However, the record does not support such wave heights.

32. It is undisputed that visually estimating wave heights is very difficult, and most people, including crew members, are not trained in how to estimate wave heights. (Dalton II:178-80).

33. Plaintiff's expert, Captain Craig Dalton, opined that the boat was going its maximum speed at the time of the accident of 10 to 15 knots. (Dalton II:99-100). Since there was only "rough" information about the time and location of the accident, Captain Dalton did not do any mathematical calculations to ascertain the speed. Rather, his

13

estimate of the speed was based principally on the plaintiff's testimony that the boat was traveling fast at the time of the accident, and his general understanding that the maximum speed of the Capt. John & Sons II would be 15 knots per hour. (Dalton II:100-102). He also opined that the wind speed was somewhere between 25 and 30 knots. (Dalton II:119).

34.     Captain Dalton also opined that the wave height at the time of the accident was 6 to 12 feet. (Dalton II:118-19). In so opining he relied principally on the plaintiff's description of events, and cited no objective evidence to support his opinion. (See Dalton II:178). In his proposed findings of fact, however, even the plaintiff himself does not credit this opinion, but limits himself to seas of 6 feet. (PFF ¶ 13). This court finds that Captain Dalton's opinion that the waves were 6 to 12 feet high is not supported by the evidence. If the seas were actually at 6 to 12 feet, the boat never would have gone out. (See Murphy III:58; Staples III:152-53). Even during Hurricane Irene the waves in Cape Cod Bay only reached 8 to 10 feet. (Staples III:152).

35.     Similarly, consistent waves of 6 feet would also have caused a great deal of discomfort, lots of water would have crashed aboard, and the trip would have been memorable. (Murphy III:58, 69). However, no one, apart from the plaintiff, described such a scene. According to deckhands Murphy and Silverberg, and Harbor Master

Officer Vico, the seas were not unusually rough during the trip, and no one else was injured.[5]  (Silverberg IV:33-36; Murphy III:51-52; Vico II:69).

36.     I reject Captain Dalton's opinion for the additional reason that it is undisputed that, during the afternoon trip, the vessel encountered waves about 2-4 feet high.  (Bradley III:99; Silverberg IV:76-77).  While the undisputed testimony is that the seas were calmer in the afternoon, (Silverberg IV:76-77), such a dramatic difference would likely have been remembered by the crew, yet they did not remember such a change.

37.     In sum, while I do not discount the possibility of random waves reaching 6 feet (see Staples III:140), I credit the defendant's witnesses who placed the waves at 3 to 5 feet during the trip.  (See Staples III:135 (average of 3 feet); Silverberg IV:34 (3 to 5 foot seas)).  Such testimony is supported by objective facts, including the marine radio report cited above and data from weather buoys, as detailed below.

38.     Professional mariners routinely rely on information from National Oceanic and Atmospheric Administration ("NOAA") offshore data survey buoys to ascertain sea conditions.  (Staples III:132-33; Silverberg IV:18).  There is quality assurance testing

---

[5]  While the plaintiff testified that he saw another passenger get hurt (see Pariseau I:69), this is denied by all defense witnesses and there were no reports of injury or other objective evidence to support this testimony.  (See, e.g., Murphy III: 51).  Moreover, Harbor Master personnel came on board to assist Mr. Pariseau.  Presumably they would have assisted any other injured passengers, but there were none.  (Vico II:69).

done by NOAA to insure the accuracy of the data, including the reporting of historical data.  (Staples III:134).

39.     NOAA Offshore Data Survey buoy 44013 is located approximately 8 miles from where the accident occurred — about 16 nautical miles east of Boston.  (Dalton II:116; Silverberg IV:18, see Staples III:127).  NOAA buoy 44022 is located approximately 10 miles north and northeast of buoy 44013.  (Staples III:128).

40.     I credit Captain Staples' opinion that the weather conditions at these buoys would be very similar to the conditions near Stone's Ledge, where the accident happened.  (Staples III:128-31, 179).  While Captain Dalton testified that these buoy readings would be inapplicable to the accident site if there were significant depth differentials, intervening land masses, alterations in the currents, or human error in recording the data, there is no evidence that any of these conditions actually existed in the instant case.  (See Dalton II:120-22).

41.     According to the buoys, the average wave height was 3 feet at the time of the incident.  (Dalton II:118; Staples III:138).  The wind speed was generally 13 or 14 knots per hour (in the 14-15 miles per hour range).  (Staples III:138; Dalton II:118).  The data from both buoys was very similar.  (Staples III:138-39).

42.     I recognize that there is other evidence which is inconsistent with my finding that the waves were 3 to 5 feet.  In particular, Captain Manning gave a different wave height in his Captain's log and in a Form 2692 accident report.  (Exs. 7-8).

Although it is unclear whether the Form 2692 was ever sent to the Coast Guard (Dalton II:108-112), I accept it as a statement written by Captain Manning.[6]

43.     In the Form 2692, Captain Manning reported a wind speed of 35 miles per hour from the northeast, and the speed of the boat at 10 knots (or 11.5 miles per hour). (Dalton II:109, 202-03; Ex. 8). Captain Manning described the accident as "Heading into 6-foot seas at slow speed, hit large wave, he fell off seat and hit his nose" resulting in "bruises" to "ankle, knee, nose." (Ex. 8; Dalton II:113). Similarly, in the Captain's log sheet for the trip (Ex. 7), he wrote that there was a wind speed of 35 miles per hour from the northeast, and a sea height of 6 feet. (Dalton II:103). Both the wave height and wind speed would have been estimates based on his visual observations; there was no equipment available to Captain Manning to measure either. (See Dalton II:173).

44.     Since the boat was heading in a northerly direction to the fishing area, into the wind, to calculate wind speed over the deck of the vessel you would add the wind speed plus the vessel speed. (Dalton II:104-06). For example, if the boat was traveling at 15 knots per hour and the wind speed was 15 knots per hour, the wind speed over the

_____

[6] While plaintiff attempts to make an issue of the "fact" that the Coast Guard could not find the report when Captain Dalton requested a copy, I do not find the issue whether the report was filed to be significant. The form was sent to CJB's insurance company, as was customary following any injury for which a claim might be made. (Bradley III:87-90). The testimony was that it was Ms. Bradley's usual practice to send the Form 2692 to the Coast Guard at the same time it was sent to the insurance company. Given that the form was sent to the insurance company, and produced in discovery (Bradley III:89-90), I find that there was no intentional effort to hide the report from the Coast Guard. This conclusion is supported by the fact that the Harbor Master, an independent entity, was fully informed about the accident and involved in assisting Mr. Pariseau. The accident was not hidden.

deck of the boat would have been 30 knots per hour. Captain Staples opined that the "apparent wind" across the Capt. John & Sons II was in the range of 20-40 knots. (Staples III:186-87). Although Captain Manning's intention in reporting wind speed of 35 mph is unknown, assuming that Captain Manning was reporting the apparent wind speed, his report would be consistent with Captain Staples' opinion.

45. While Captain Manning was not available to explain his entry of 6 foot waves, it does not appear that it was intended to describe the sea height throughout the trip. Rather, it appears to be a statement that supports the Captain's description of the accident — the boat hit a large wave. Captain Manning does not give a range of wave heights, which one would expect since waves are not uniform in height. (See Staples III:135-36, 139-40). Moreover, Captain Manning wrote that the boat was "heading into" waves 6 feet in height, not that it was traveling in such a rough sea. In sum, in considering all the evidence, I find that while there may have been random waves reaching 6 feet, in general the vessel was traveling in seas of 3-5 foot waves. Such waves would not produce the extreme bouncing described by the plaintiff.

## Other Inconsistencies

46. I also find that Mr. Pariseau's description of events is belied by the testimony of other members of his own party and objective facts.

47. For example, although Mr. Pariseau testified at trial that he was seated for the whole trip holding onto his children so they would not be bounced overboard (see Pariseau I:120), at his deposition he testified that he had been standing for an extended

period of time prior to his fall.  (Ex. G at 109-20).  His medical records also indicate that he had lost his balance and had fallen from a standing position.  (Ex. 16 at p.7).  Thus, it is unclear whether Mr. Pariseau was even seated before he fell, thereby calling into question the accuracy of his testimony about the events in question.

48.    Mr. Pariseau also testified that there was no railing to hold onto in the front of the boat where he was sitting.  Rather, he asserted that there was just a cable wire strung between posts.  (Pariseau I:47, 109).  However, the photograph of the vessel shows a solid metal rail and not a cable.  (Dep. Ex. 3 (Trial Ex. 2); see Pariseau I:109).  The deckhand, Leo Murphy, also testified that there is a metal rail, but no wire cable. (Murphy III:26-27).

49.    Contrary to Mr. Pariseau's testimony that the children were all being tossed about, Mr. Pariseau's stepson, Weyland LeBelle, testified that he was standing most of the time, and that although the ride was bumpy, he was able to hold onto the rail and he did not fall.  (LaBelle II:39).  He further testified that although sometimes he was lifted maybe 1-2 inches off the deck, mostly he kept his knees flexed so he could react to the bumps, and it was fun.  (LaBelle II:39-40).[7]

_____

[7] Mr. Pariseau testified that his body was lifted off of his seat 4-6 inches up to a foot, at least four times before he fell.  (Pariseau I:118-19).  This seems to be a physical impossibility for a 6' tall man weighing in excess of 300 pounds, and inconsistent with Mr. LaBelle's testimony. (See Ex. 15 at p. 2).  Moreover, it is illogical that Mr. Pariseau would not have even attempted to bring the children inside the enclosed galley if the ride was that dangerous.  (See Pariseau I:118-19).

50.     Moreover, contrary to Mr. Pariseau's description of events, Mr. LaBelle admitted that Mr. Pariseau encouraged the children to have fun and fish, and that they did so and had a good time.  (LaBelle II:16-17, 34-35).  Mr. LaBelle caught some sharks and had an "enjoyable" time fishing.  (LaBelle II:34-35).  A deckhand helped him hold onto "a decent-sized shark."  (LaBelle II:35).

51.     Mr. Pariseau's son, Shawn Jr., also testified by deposition that when the boat first came to a stop, he asked his father if he could fish, and Mr. Pariseau said yes. He further testified that Mr. Pariseau assisted him while he was fishing, and took pictures of his son with one of the deckhands.  (Ex. C at 21-25).  Such testimony refutes Mr. Pariseau's description of total chaos and inattentive deckhands.

52.     Although two of the younger children were a bit seasick (see LaBelle II:11; Pariseau I:56),[8] according to Mr. LaBelle a deckhand helped them and told them how to avoid being seasick by looking at the land, and other helpful tips.  The deckhand "was extremely nice" to them.  (LaBelle II:22).  Moreover, while these children may have been queasy, Shawn Jr. was feeling well enough to eat a cheeseburger during the trip. (LaBelle II:14).

53.     Mr. Pariseau further testified that no one from the crew was attentive to his needs.  However, Mr. LaBelle testified that the Captain came to see how Mr. Pariseau was doing two or three times after his fall.  (LaBelle II:14).  In addition, according to Mr.

_____

[8]  It is undisputed that seasickness can happen on flat, calm days as well as on bumpy rides.  (Silverberg IV:33).

LaBelle, members of the crew engaged in "friendly chattering" with Mr. Pariseau in order to make sure that he did not faint and was all right. (LaBelle II:17).

54.     Based on this testimony, as well as the credible testimony of defense witnesses discussed infra, this court does not accept Mr. Pariseau's description of the events surrounding his fall. Similarly, this court is not persuaded that Mr. Pariseau's condition after the fall appeared nearly as severe as he claims, or that the crew was inattentive to his needs or failed to react with an appropriate level of concern and attention.

### Events Surrounding the Accident

55.     This courts finds the following facts concerning the accident. Mr. Pariseau was in the bow of the boat with his children at approximately 8:30 a.m. As detailed above, it is unclear whether he was sitting or standing at that time. It is also unclear whether, as Mr. Pariseau testified, he had a seat on the bow, or whether, as his stepson testified, he was sitting on the bench located on the bow, further away from the rail. (LaBelle II:46). I find that, while the ride was somewhat bumpy, it was not uncomfortably so, and it was not dangerous. (See Silverberg IV:34, 36). The boat's speed was appropriate for the weather conditions. I reject the plaintiff's testimony that there was chaos on the boat, and accept the testimony of the crew members that the ride to the fishing ground was uneventful, albeit a bit bumpy at times.

56.     Somehow, Mr. Pariseau fell and landed on his right side, banging his leg, face and hip. (Pariseau I:52). He also had a nosebleed. (Pariseau I:57).

57.     Mr. Silverberg was in the wheelhouse checking in with the Captain when he heard a thump.  (Silverberg IV:36).  As he was leaving to investigate, Ben from the galley called the Captain to say that someone had fallen in the front of the boat.  (Silverberg IV:37).

58.     Mr. Silverberg went to Mr. Pariseau who was sitting on the deck.  Mr. Pariseau stated that he had lost his grip when the boat hit a wave, and that he had fallen on the deck.  (Silverberg IV:39).  Mr. Murphy also came by to see what had happened. (Murphy III:45).

59.     Mr. Pariseau testified that he banged his nose on the rail as he was falling after he was bounced out of his seat, and that he threw up and was bleeding profusely. (Pariseau I:56-57).  According to Mr. Silverberg, however, Mr. Pariseau had a slight bloody nose, and Mr. Pariseau told him that he had scraped it on the stool or bench area trying to get up.  (Silverberg IV:46-47).  Mr. Pariseau's face was not otherwise bruised. (Silverberg IV:55).  None of the medical records indicate that Mr. Pariseau was covered in blood or vomit, although such information was called for in the records.  (See Ex. 16 at p. 7).  I accept Mr. Silverberg's description of Mr. Pariseau's condition.

60.     I also reject Mr. Pariseau's testimony that he was in severe pain, that he repeatedly demanded that the Coast Guard be called and that he be returned to shore, and that the crew ignored his needs and laughed at him.  Rather, I find, as the deckhands testified, that Mr. Pariseau was adamant that he was fine, and was concerned that his children have a chance to fish and enjoy themselves.  (Silverberg IV:40; Murphy III:46-

47).  He also told the deckhands that while his leg was sore, he did not think that it was anything serious, and he refused to let the deckhands look at it.  (Silverberg IV:41-42, 44, 47).  Such a scenario is consistent with the concern that Mr. Pariseau obviously felt for his family, and is consistent with the children's testimony discussed above.

61.    After he fell, Mr. Pariseau was returned to a seated position on the bench in the bow.  In addition to Messrs. Silverberg and Murphy, the Captain also came by to see what had happened.  (See Murphy III:45; Silverberg IV:39; LaBelle II:14).  Since Mr. Pariseau was adamant that he did not need medical treatment, the Captain, after consulting with Mr. Silverberg, decided to continue the trip, in accordance with Mr. Pariseau's wishes.  (Silverberg IV:42-45).  Mr. Pariseau was offered some food, something to drink, and ice for his leg, which was appropriate given his representations concerning his condition.  (Pariseau I: 58, 65).

62.    The deckhands, Messrs. Silverberg and Murphy, made a conscious effort to spend time with the children, and to make sure that they caught some fish and had a good time.  (Silverberg IV:45).  Mr. Silverberg in particular spent most of the rest of the trip in the bow area, in sight of Mr. Pariseau.  (Silverberg IV:45).  Mr. Murphy helped the children fish, and some of them caught a few dogfish and some sand sharks.  (Murphy III:47).  The boat stopped to fish twice and, as detailed above, the children did have a good time and fished.  (See also Murphy III:49-50; Silverberg IV:46).

63.     After awhile, Mr. Pariseau began to complain of feeling nauseated, at which time Mr. Silverberg told the Captain that Mr. Pariseau's condition warranted them cutting the trip short and returning to shore.  (Silverberg IV:48-49).

64.     There is evidence that the Captain called the Harbor Master at 10:05 a.m. to report that a passenger had been injured.  According to the notes of the conversation, Captain Manning reported that a passenger had hit his head, and that "[a]t this time the patient is in and out of consciousness and has vomited blood."  (Ex. 4).

65.     This description of the plaintiff's condition is inconsistent with all the other objective evidence.  As an initial matter, the children reported wanting to fish and enjoying themselves as detailed above.  In this court's view, it is unlikely that they would have behaved this way if Mr. Pariseau was, in fact, unconscious at any time, or if he was vomiting blood.  Moreover, neither the medical records nor the report from ambulance personnel who took the plaintiff to the hospital indicate that Mr. Pariseau had been unconscious, or that he had vomited blood — conditions which would have been reported to emergency personnel.  (See Exs. 14 & 16).  Furthermore, the Harbor Master Officer who attended Mr. Pariseau did not witness these conditions.  (See Vico II:72-73, 79).  Finally, Captain Manning just reported that Mr. Pariseau was bruised in the Form 2692 accident report.  (Ex. 8).  There is no mention of vomiting blood or loss of consciousness.

66.     In my view, it is more likely that Mr. Pariseau's broken ankle really started to hurt after awhile, and his discomfort became greater than his desire to have the children enjoy the trip.  Between the pain, his bloody nose and the boat's movement, Mr.

Pariseau must have been nauseous and uncomfortable, and perhaps even feeling faint. His report of these conditions to the deckhands, who in turn reported to the Captain, who in turn called the Harbor Master for the purpose of getting assistance to Mr. Pariseau, resulted in a message of the type reported in Exhibit 4. Having considered all the evidence, this court still finds that Exhibit 4 does not accurately reflect Mr. Pariseau's condition at 10:05 a.m. on the date of the accident. I also find, however, that the report to the Harbor Master is indicative of the crew's concern for Mr. Pariseau — he was not simply ignored.

67.     Captain Dalton opined that the crew should have sought medical advice earlier, and that Mr. Pariseau should either have been brought to a closer port or removed from the boat sooner than he was.

68.     I accept Captain Staples' contrary opinion, and find that the attention the crew gave to Mr. Pariseau was appropriate given his description of his medical condition. Also, any attempts to remove him from the boat while at sea could have endangered him as it is a dangerous procedure. Moreover, since there was no crisis, there was no reason to go to an unfamiliar port with unknown medical facilities. (See Staples III:168-70, 174-75)

69.     The Harbor Master Department is responsible for responding to boating emergencies, as well as for the enforcement of boating laws, and is staffed by profession-ally trained and experienced personnel. (Ex. 5). After receiving the report from the Capt.

John & Sons II, the Harbor Master dispatched several officers to respond to the call. (Ex. 4).

70. Although Mr. Pariseau testified that no one from the Harbor Master's office approached him until the boat docked, (see Pariseau I:78-79), I accept the testimony of Officer Jose Vico of the Plymouth Harbor Master Department. Officer Vico testified that he and another officer took a Harbor Master Patrol vessel out to the Capt. John & Sons II when the boat was at the tip of Gurnet Point, about 8 miles off the town wharf. (Vico II:57). The two officers boarded the boat and saw Mr. Pariseau seated on a bench. (Vico II:58-60). They checked his vital signs, and immobilized his leg. (Vico II:77). Additionally, they stayed with Mr. Pariseau for approximately 15-20 minutes before the boat reached the dock. (Vico II:64).

71. Mr. Pariseau was a large man. It took eight people to carry him off the boat on a long spine board. (Vico II:62). These included fire fighters, Plymouth police personnel and ambulance personnel, in addition to the Harbor Master personnel. (See Pariseau I:78-81). There was discussion about his size since a number of people had to help move him. However, I do not find credible Mr. Pariseau's statement that people were ridiculing his size or laughing at him.

72. Mr. Pariseau was taken to Plymouth Hospital by ambulance. (Pariseau I:85). He was diagnosed with a broken leg and kept overnight at the hospital. He had a cast on, but it was removed after one day due to swelling. Afterwards he wore a removable leg stabilizer (or boot) for about three months, and used either crutches or a

26

wheelchair. (Pariseau I:90-93, 98-99, 141). He then went to physical therapy for about 1½ months. (Pariseau I:99).

73.    Because Mr. Pariseau was a Type I diabetic, he has to pay special attention to the condition of his feet. (See Pariseau I:88-89; Ex. 15 at pp. 3-4).

74.    Mr. Pariseau testified that he believed that all the children should have been brought to the hospital "because they were all getting sick, vomiting, and they were all complaining of hurt places on their bodies." (Pariseau I:137). None of the children were, in fact, taken to the hospital, and there is no indication that they actually suffered from any injuries.

## **Alcohol**

75.    According to Mr. Pariseau, he smelled alcohol on the Captain's breath when the Captain came to see what had happened after the fall. (Pariseau I:65-67). Mr. Pariseau also testified that he repeatedly demanded that the Captain take a breathalyzer test, including when he was brought ashore. (Pariseau I:81-83). However, no one admitted to hearing any such statement, including his stepson Weyland LaBelle, who was standing nearby. (LaBelle II:22). According to Officer Vico, and Messrs. Murphy and Silverberg, Mr. Pariseau never mentioned that he thought the Captain had been drinking alcohol. (Vico II:65, Silverberg IV:61; Murphy III:46). Similarly, there is no mention of any alcohol in the medical records or in the ambulance report. (See Exs. 14 & 16).

76.    The Harbor Master has zero tolerance for boating under the influence of alcohol. (Vico II:66-67). CJB also has a policy prohibiting its employees from

possessing, consuming or distributing drugs within its facilities or from reporting to work or performing their duties after having taken drugs. (Ex. 12; Dalton II:143-44). Although Mr. Pariseau believes that there was a conspiracy to hide the fact that the Captain was drinking (Pariseau I:155-57), there is no evidence that the Harbor Master had any ulterior goal, or was otherwise attempting to circumvent its obligations to enforce navigation laws and to make sure boating is safe. Similarly, there is no evidence that the fire department, police or ambulance personnel would have turned a blind eye to any allegation of drinking by Captain Manning.

77.     Marine regulations require drug and alcohol testing after a "serious marine incident" on board a vessel. (Dalton II:135, Ex. 10). Alcohol testing must be performed within two hours of such an incident, and drug testing must be performed within 32 hours. (Dalton II:140). A "serious marine incident" is one which "requires professional medical treatment beyond first aid," which is the same requirement that triggers the need to file an accident report. (Dalton II:136; Bradley III:111). Serious marine incidents are also supposed to be reported to the Coast Guard, as would an explanation for why no drug testing was done. (Dalton II:136-37).

78.     The experts at trial offered differing opinions as to whether Captain Manning should have taken a drug and alcohol test. Captain Dalton testified that since Mr. Pariseau's injury required that an ambulance be called, there was a "serious marine incident" requiring the filing of a Form 2692 and a drug and alcohol test. (See Dalton II:133-34). He also opined that there should have been instant communication with on-

shore medical personnel after the accident to determine whether Mr. Pariseau required immediate medical care. Captain Staples testified, however, that given that the crew did not know that Mr. Pariseau had broken his leg, but rather just assumed he had been bruised, no drug test was needed. (Staples III:160-62). He did concede that if the crew had known that Mr. Pariseau's leg was broken and needed to be set, a drug test would have been required. (Staples III:163).

79.     I find that it would have been prudent for a drug and alcohol test to have been administered. However, given Mr. Pariseau's statements that his injuries were not serious, I cannot find that the testing was mandatory. Moreover, no one apparently thought that a drug or alcohol test was needed. Neither the crew, nor the police, fire fighters, ambulance personnel or Harbor Master thought that there was any need for testing. Similarly, the crew did not think that there had been a serious marine incident requiring testing. (See Silverberg IV:57-58).

## Mr. Pariseau's Current Condition

80.     Mr. Pariseau testified that he continued to feel pain in his leg up until the time of trial. (Pariseau I:96).

81.     Mr. Pariseau contends that he is prohibited from working on ladders or staging, which interferes with his work in his family's renovation business. (Pariseau I:97). Although he is dyslexic and had difficulty reading, he is now doing blueprint reading, estimating, and engineering of trade show floor plans. (Pariseau I:103, 143). He

has not lost any wages as a result of the accident, although he contends that he has suffered a reduction in earning capacity.

82.     Mr. Pariseau last saw someone from his orthopedic doctor's office six months after the accident.  (Pariseau I:103).

## RULINGS OF LAW

1.     Mr. Pariseau brought this action in admiralty in order to recover under a theory of negligence.  "[N]egligence causes of action in admiralty invoke the principles of maritime negligence, not those of the common law."  <u>La Esperanza de P.R., Inc. v. Perez Y Cia. de P.R., Inc.</u>, 124 F.3d 10, 17 (1st Cir. 1997).  Therefore, for purposes of Mr. Pariseau's negligence claim, CJB's conduct must be measured "by the standards of maritime law" rather than those of state common law.  <u>Kermarec v. Compagnie Generale Transatlantique</u>, 358 U.S. 625, 628, 79 S. Ct. 406, 408, 3 L. Ed. 2d 550 (1959).

2.     In order to establish negligence under general maritime law, the plaintiff must "'demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury.'"  <u>Evans v. Nantucket Cmty. Sailing, Inc.</u>, 582 F. Supp. 2d 121, 137 (D. Mass. 2008) (quoting <u>Canal Barge Co., Inc. v. Torco Oil Co.</u>, 220 F.3d 370, 376 (5th Cir. 2000)) (alteration in original; additional quotations and citation omitted).  Mr. Pariseau has the burden of proving each element of his negligence claim by a preponderance of the evidence.  <u>Marquette Transp. Co., Inc. v. La. Mach. Co., Inc.</u>, 367 F.3d 398, 402 (5th Cir. 2004); <u>Wille v. Dana</u>, 962 F. Supp. 1334, 1336 (D. Or.

1997), aff'd, 198 F.3d 256 (9th Cir. 1999). While Mr. Pariseau has shown that CJB owed him a duty of care, and that he sustained injuries while aboard the defendant's vessel, he has not met his burden of proving the remaining elements of his claim by a preponderance of the evidence.

3.    "It is axiomatic in maritime law that a carrier owes a duty of exercising reasonable care towards its passengers under the circumstances." Muratore v. M/S Scotia Prince, Etc., 845 F.2d 347, 353 (1st Cir. 1988). Thus, while "the degree of care required must be in proportion to the apparent risk[,]" the standard is what a reasonable prudent vessel owner would do under the particular circumstances of the case. Id.

4.    Mr. Pariseau claims that CJB breached its duty of care by operating the Capt. John & Sons II "at a speed, on a course, and in sea and weather conditions which caused the vessel to react in a way which endangered the passengers." (PRL ¶4). Mr. Pariseau also claims that CJB breached its duty of care by failing to provide medical treatment more promptly. For the reasons detailed above, I find that the defendant did not breach its duty of care owed to Mr. Pariseau. The boat was not operated inappropriately. Rather, it proceeded in a manner suitable to the sea and weather conditions. In addition, the medical attention given to Mr. Pariseau was sufficient and appropriate given his reported injuries.

5.    Moreover, Mr. Pariseau has not shown that there was a causal connection between the defendant's conduct and his injuries. "[C]ausation under general maritime negligence law is similar to the common law which requires 'but for' causation coupled

31

with 'proximate or legal' causation." Evans, 582 F. Supp. 2d at 144 (quotations and citation omitted). Therefore, in order to establish causation, the plaintiff must prove that the defendant's negligence was not only a "'but-for cause'" of the plaintiff's injuries, but also "'a contributory and proximate cause'" of those injuries. Id. (quoting Inter-Cities Navig. Corp. v. United States, 608 F.2d 1079, 1081 (5th Cir. 1979)) (additional quotations omitted). "In other words, '[t]o give rise to liability, a culpable act or omission must have been a substantial and material factor in causing the [plaintiff's harm].'" Id. (quoting Inter-Cities Navig. Corp., 608 F.2d at 1081) (additional quotations omitted).

6.      In the instant case, Mr. Pariseau failed to prove by a preponderance of the evidence either that the operation of the boat was the proximate cause of his injuries or that the medical treatment (or lack thereof) exacerbated his injuries in any way.

## JUDGMENT

For all the reasons detailed herein, Judgment shall be entered in favor of the defendant.

_/ s / Judith Gail Dein_____
Judith Gail Dein
United States Magistrate Judge
